Your Honor, may I request two minutes of rebuttal time? Fine. Thank you. Once again we are back before this Court. In this instance the various Commonwealth officials who were, some of whom were defendants below, are now the appellants in this matter. Again we are back on cross appeals. And in this instance we are contending that the District Court erred in two ways. First it erred on the issue of standing in determining that one of the plaintiffs in the case, the Pennsylvania Prison Society, had standing to pursue the claim of Cortes is that the 1997 amendments to the Pennsylvania Constitution, which changed the way the Board votes in cases of commutation by lifers, from changing the rules from a majority to a unanimous vote in order to obtain a recommendation to the Governor, violates the ex post facto clause. The District Court ruled in favor of the plaintiffs on that issue, the Pennsylvania Prison Society, after it resolved the standing issue. In both respects we say it is wrong and we ask this Court now to reverse. Of course if the Court reverses on the standing issue and determines there was no standing, it does not need of course to reach the substantive issue. On standing, Smith and Thompson would appear to be directly affected, would they not? They, in the past, they had a vote, Your Honor, where the new rule was applied to them. And in that instance they received a majority but not a unanimous vote. However, Your Honor, that happened in 2005. And they took no action to redress any wrong by that action. But they're getting ready to reapply, are they not? I understand they're saying they're contemplating reapplying. I don't know when concretely that may occur. But again, application here, as this Court previously perceived, is not dispositive of the standing issue. What's key is whether they will get over a hurdle known as merit review because only then does the new rule apply. Anybody who doesn't make it over merit review to a full vote on the merits never has the rule applied to them. So it's more than just them applying, putting an application for it. They have to clear a merit review. In other words, they have to have three votes. Who would have standing then? Someone who has been through the process or is about to be, who has cleared the merit review hurdle, is about to be subjected to the new rule. Or someone who has been through the process and has had a negative effect of the new rule, like they received a majority but not a unanimous vote. Does that sound like Smith and Thompson? It sort of does, but except that they had a period of time in which to redress any wrong that occurred to them by that and they didn't take it. Your position is they had two years? Yes. Standard statute of limitations for civil rights action, Your Honor. And they were fully and they did nothing. So they would be eligible again? They might be. We don't know. We don't know if they'll clear merit review. Okay. But assuming they clear merit review and get less than the unanimous vote but a majority vote, then they would qualify. They would have standing. I think at that point, yes. If they have cleared merit review and they've received a vote that is majority but not a unanimous vote, at that point, yes. But under, what did Judge Caputo say specifically with respect to the standing for both of them? I don't think he specifically reached the standing issue in the same kind of analysis that he did for the other actual plaintiffs in this case. The remaining, there was actually one at that point. When he ruled on the last, the last time he ruled, there was only one plaintiff left, one individual plaintiff. And in that case, he said that particular person, his name is Hollis, was too speculative. Am I correct that his order would appear to cover those two individuals? No, Your Honor. I don't think it does. He made a determination they cannot participate. And he, and now he made that determination via his ruling on their application to intervene. And at the near the end of his opinion, he says that they're not allowed to participate. That the only party who has standing here is the Pennsylvania Prison Society. So all we have is Hollis and the Pennsylvania and the Prison Society. And the Prison Society, right. And he, well, he determined Hollis did not have standing. I understand. So we only have the Pennsylvania Prison Society. Correct, Your Honor. And why doesn't it have organizational standing? For two reasons. First, its own interest is not implicated in the situation. The society is not looking for commutation itself as an entity. So it doesn't have a direct interest. And secondly, it has not demonstrated that its members, any of its members have a standing, which is a requirement under the Hunt case. It's one of the essential elements under the Hunt case. There's also another... And these would have been the two, if the interveners had been allowed to intervene, then they would have had, your position would be different? Yes, I believe at that point they probably would have demonstrated enough for standing assuming they had a timely, appropriate claim, appropriately articulated claim. But I think it appears based on what we know that that would be the case. So Smith and Thompson, in your view, had filed within two years. They did not file. I know, but if they had, then... They could have individually pursued claims with me. The society then would have had organizational standard or association standard? I'm not entirely... No, Your Honor, I think there's another problem with that too. And though we really didn't get into it in a great deal, I think the society itself, based on what we have in the record, it's not entirely clear they would have had standing because the society itself is not just composed of prisoners who may put in for commutation. It's composed of a whole bunch of different types of individuals. People of interest in the prisons, that sort of thing. Advocacy, people who are associated in charitable works, any number of different things. And it's not clear here that the membership of the society is so pervasive as to have... to meet that last element too of organizational standing, that the need for... that there's no need for the individual claims to be articulated via the organization. There is another matter here, though, too, and I think a very important one. On the last round of appeals before the court, there was a discussion of the various groups that sought to pursue this litigation. There were, at that time, three different distinct groups. One called voter tax payers, another called organizational plaintiffs, which included the prison society, and the three individual plaintiffs. The court went through the first two groups, the voter tax payer plaintiff and the organizational plaintiffs, and concluded, at the end of it, that they did not have standing. But it went on to do something else, and to use this court's own word, significantly, it said they had not contested the issue of standing. That, we believe, clearly shows they can't contest it. Now, they've waived it. And a failure to pursue the issue on appeal means it's waived, and we've cited authorities of this court in our brief that say that. And we objected. When this matter went back to the district court, we immediately objected to them adducing evidence and saying that this court's ruling was law of the case, that they did not have the ability to pursue anymore, or to participate anymore. The only people who, theoretically, could put on evidence in the wake of the court's ruling were the three individual plaintiffs. And by that point, by the time we got to the evidentiary hearing, two of those three had already were on their way to withdrawing from the action. One, clearly, the inmate who was sentenced to death, Roger Buell, had indicated he was no longer participating, and Mr. Johnson, who did testify, but whose status changed. He's no longer alive, and there's been no dispute over that. Also, essentially, he ceased to participate in the case. But we think that prior ruling here is very important, and basically said that when this matter went back to the district court, the court couldn't take evidence with respect to the prison society. It had to be the three individual plaintiffs. And we believe the court, on that basis, the court should say that there was error on the district court's part for allowing that to go forward. We not only objected at the beginning of testimony, we renewed that argument in our post-hearing briefing also. And the court did not accept those arguments, but we think it was error for them not to. What the court did was it looked, and this was an argument made by our opponents, it looked at language near the end of the opinion, which just generally refers to plaintiffs have the opportunity to present evidence. But that was wrong, because it takes that language out of context. You have to look at everything that went before it to understand, in the context of the opinion, that reference means the plaintiffs that are left, the plaintiffs who actually were contesting on the standing issue. Because there's no doubt here the three individual plaintiffs did fight about standing. They continued to litigate that in the Court of Appeals, whereas the voter taxpayer and the organizational plaintiffs did not. The individual plaintiffs did not waive the issue. The others all did. The district court's opinion, too, is a little bit inconsistent. And I say this with all due respect, but when it gets back to the district court and it's issuing its opinion, it makes reference to how it's going to adopt, and that's its word, not mine, adopt this court's prior ruling on the voter taxpayer plaintiffs, but then goes on to talk about how the present society has standing. It doesn't seem to understand that when this court talked about voter taxpayer plaintiffs and organizational plaintiffs, it was treating them in both groups in the same fashion. And so if it was adopting the court's ruling on the voter taxpayer, it had to adopt this court's ruling on the organizational plaintiffs as well, because they were a package deal based on what the court had said in its prior opinion. Could I ask you if you wouldn't mind, well, there's a little bit of time you have left, to address the merits here? Yes, Your Honor. Again, we say we only reach the merits if they're standing. We believe there was a serious mistake in the district court's approach here. It ignored the basic tenet of any ex post facto claim, and that is you have to start by focusing on what's the punishment the law attaches to a crime at the time it's committed. And only if whatever you're disputing alters that punishment that the law prescribed do you have an ex post facto problem. And here, there is no problem of the sort. The problem you have is we're in a circuit that has the Mickens-Thomas case. How would you distinguish that? Mickens-Thomas is the opposite here, and that's because it doesn't deal with the commutations slash pardons process, which is a wholly separate animal from what Mickens-Thomas dealt with, which was parole. And that's because in Pennsylvania, like a lot of states, parole is sort of the de facto lower end of incarceration under our system of law in Pennsylvania. Because in Pennsylvania, most prisoners other than life or people from the first degree murder or second degree murder are sentenced to a term of years. Usually, there's a lower end and a higher end. And that lower end is what triggers the possibility of parole. So if you start doing things that alter that lower end, in other words, if you start imposing rules or regulations administratively or substantively that no longer make that person able to obtain parole when the statute says they might be able to obtain parole, then if you make it much more difficult or delay it, then you potentially have an ex post facto problem. And I'm saying potentially because it will have to depend on the individual circumstance. But like in Mickens-Thomas' case, he was subject to new rules that changed the substantive evaluation of parole applications and shifting the main focus to security issues as opposed to rehabilitative analysis that used to be in place. And he was disadvantaged by it because under numerous stringent standards, that made his application far more difficult to obtain parole. You don't get a parole automatically, but you have the opportunity to be paroled as soon as your minimum date passes. Isn't that the same thing? No, you're fine. Isn't that the same thing for commutation? You don't get it automatically, but at least they want to have the opportunity to have it presented to the governor. You always have the opportunity, but it is a separate process. It doesn't get there if you don't have unanimity. That's true, but it is not part of the sentencing process. And that's the key here. It is a separate process. It's clemency, executive clemency, whereas parole is part of the sentencing process and it has the potential of affecting your sentence. In terms of what the law prescribed at the time you were sentenced, the classic standard for ex post facto, because depending on what you do to alter parole regulations and procedures, you can theoretically have a person spending more time in prison when they are technically parole eligible from a time point of view. The easiest way I could describe this is if a person is a two to four year sentence and is time eligible for parole at the expiration of two years, if the department that administers the parole board suddenly promulgates regulations and says we're not going to take any applications for people who have these kinds of sentences, so they've served a full additional year beyond their minimum, that arguably changes the sentence you had at the time you were convicted of the crime. Because the sentence you had at the time you were convicted of your crime anticipated. Why can't you argue that the Constitution provides for commutation, executive clemency, and even though it does not deal with the punishment, punishment is fixed, it's life term, you're taking away the opportunity or you're significantly diminishing the opportunity to receive commutation even though it has a separate step, which of course is the governor's approval. Because I think, Your Honor, the fact that it doesn't affect your punishment, even though it may have a negative effect on you, because it doesn't technically affect your punishment as it existed in the law at the time you committed your crime, means it doesn't have an ex post facto effect. Just because something is negative doesn't mean it has ex post facto qualifications as Garner v. Jones says. What's key here is it has to change the punishment for which you were liable at the time you committed your crime, change what the books, the punishment on the books, to use a kind of a vernacular type of example, that existed at the time. And that's a key difference here. And I see my time is up, and unless the court has questions, I'll just... And your view, this is an individual inquiry? Assuming we get beyond the punishment distinction, this would be an individual inquiry for each person? The determination as to whether or not there's any application of the ex post facto law would be individual to each? Yes, I believe so. And that's how the process works, Your Honor. Mr. Winston. Morning. Morning. Or is it afternoon? It's afternoon. Good afternoon, Your Honors. May it please the Court, I'm Stephen Winston, representing the Appellees Cross Appellates. And I'd like to address, I'd like to open up by addressing some of the points made by Ms. Sapp in her argument. Number one, in terms of both Mr. Smith, in terms of Mr. Smith and Mr. Thompson, I think there are several important things to recognize. First of all, Mr. Thompson, pretty much immediately after this court, the district court's ruling, yes, after the district court's ruling in 2006 wrote the judge and said, Judge, what about me? And I think under the consideration of how a court looks at pro se applications, I think it's fair for the court to understand that this was Mr. Thompson's first effort to get his issues before Judge Caputo. And Judge Caputo said, no, Mr. Thompson, you're not a party to my case. By that point, we were on appeal, and there was really very little we could do up here. Then the court, this court issued its decision in 2007, and that's important for this reason, that the time period in looking at whether an intervention is timely, this court in the Mountaintop case said you have to look at, the clock starts to run when the intervener knew or should have known that the existing parties were not protecting his rights. It wasn't until the court questioned the standing of the existing plaintiffs that Mr. Thompson had any reason to believe that the existing case would not be sufficient to adjudicate whether or not these amendments were valid or not. So he immediately took action, and the judge again said no. We brought it up. The very first thing we did after remand was have a conference before Judge Caputo. It's off the record, but Judge Caputo's order, which follows immediately after that conference, says there will be no interventions at this point. So I think it's fair to, I can tell you I was there. I argued that we should be allowed to file a motion to intervene. Judge Caputo said no. We reiterated that request several times during the case as it proceeded in the district court, explicitly made it right before the evidentiary hearing. He said no again, and then by the conclusion of the evidentiary hearing, after hearing Mr. Thompson testify and after hearing Mr. Smith testify, Judge Caputo allowed us to make a motion to intervene, which we did, and he denied. But isn't your argument, in effect, that the society was adequately going to represent the interests of people like Thompson and Smith? That is correct. I was addressing the statute of limitations objection that the other side had made. And second, Mr. Smith has a pending application, and there's testimony to that in the record. Mr. Thompson, the only reason he hasn't filed is that there was some glitch with his Social Security number. Mr. Hollis has an application pending. So everyone either has to- Although Hollis, his prior, he was one in favor of commutation, four against. Hollis, or I'm sorry, Thompson and Smith were four to one the other way, four in favor, correct? That is correct, post-2005. Mr. Hollis, his applications were back in the 1990s. He had one four to one yes vote, and it went to the governor. Then the next time he applied, he had one in favor, four against. And the record will reflect that the principal reason for that is because he didn't have the support of the Department of Corrections in that application. The reason he didn't have the support of the Department of Corrections is that he was caught dilly-dallying with his wife in the visiting room. So that's what that was all about. And if you look at the testimony about who Mr. Hollis is and what he's done in prison, I think you'll find that he comports perfectly with the records of the individuals who had been previously approved by the board. The point about the varied nature of the membership of the Pennsylvania Prison Society is completely irrelevant. All that an organization needs for standing is to have one person that has a concrete, legitimate Article III interest in the case. I mean, you look at these cases that have involved the Sierra Club and the cases in front of the Supreme Court, all they talk about is one individual. The parents involved case, one person, one parent from Seattle, one student from Seattle, one student from Jefferson County, that was enough to make parents involved to give them standing in the case. It isn't part of the problem here also that we're being asked to speculate as to whether, how successful these persons would be. Prior to 97, of those who achieved a recommendation of commutation, what was the percentage in the last 5, 10 years before 97 of those who actually got commutations? I don't have the answer to that off the top of my head. It depends upon what year you look at. When I looked at it, it seemed like life changed a lot after 94 because of the incident that happened in 94. That's correct. Absolutely correct. But let's say prior to that. So after 94, or prior to 94, it looked like there was a decent chance. Post-94, pre-97, it looked like there was a real turning off of the spigot, if you will. Well, I think there were many fewer positive recommendations forwarded by the Pardons Board beginning at that point in time. So it's hard. There's such a small universe that you can't draw too many inferences based on percentages, based on such a small universe. I think if you look back farther, you'll find that in many instances, in many years, over some extended period of time, governors generally, well over 50 percent, granted or agreed with the positive recommendation of the board. And I believe those statistics are in the record, and I can provide them to you if you'd like. But that's what the record would reflect. On the merits, do you want to turn to that unless there's any other questions? Yes. I think this case is definitely controlled by Mickens-Thomas. There's no way to get around it. Mickens-Thomas controls. Let me ask you a question about your reliance on Mickens-Thomas. Wasn't that case, in that case, wasn't a decision of the parole board involved? Yes. Not the Pardons Board? Correct. And I didn't find any reference in reading Mickens-Thomas to the power of the Pardon Board to make recommendations and the power of the governor to deny a commutation, even if it were recommended. Did you find anything, any reference to pardons in Mickens? Well, Mr. Thomas was, did receive a commutation. I understand that, but that's not. Preliminary to that. The decision starts off the first sentence. This appeal has its genesis in the material modification of parole laws. Correct. By the Pennsylvania legislature in 1996. Correct. And corresponding changes in the parole decision. Correct. Absolutely. So my question to you is, is there any application at all of Mickens to the pardon? Yes, there's an application by analogy. All right. And if I may, I can give you the analogy. Let me give you another question and then I'll listen to you. All right. I have trouble, I have trouble in researching finding any case where a decision by a governor in Pennsylvania assisted by a Pardons Board was denied that any court has the judicial power to consider that. Certainly they do in parole. And that's what Mickens talks about. Do you know of any case where a court has held that it has jurisdiction to consider the denial of commutation? A governor's denial? Yes. Oh, absolutely not. And we're not challenging that the governor has the right to deny a commutation for whatever reason. My question is, can you challenge the failure to grant a commutation in a court? Not by the governor. Absolutely not. What about, well, in Pennsylvania? No. It's the Pardon Board and the governor that work together. Well, they work separately. But they're part of a chain of command. They're part of a timeline. The commutation power under Pennsylvania Constitution is given to a Pardon Board and the governor. Isn't that true? No. Commutation right is given to the governor upon recommendation by the Board of Pardons. And the governor can reject? The governor can absolutely reject. Yes. Aren't you asking us to review the commutation power here? And do we have the jurisdiction to do so? What we're asking is for the court to review the change in the way the commutation board operates. And the commutation board is the only pathway to the governor is through the commutation board. If there's no pathway through the commutation board, then there's nothing for the governor to do. He sits there and he gets nothing. So what we're saying is that by making it more difficult to get to the governor, that cannot be done the way this was done without violating the ex post facto law when applied to the individuals convicted prior to the change. The importance of the action of the commutation board cannot be overstated. If there wasn't a need for a commutation board, it wouldn't be enshrined in the Pennsylvania Constitution. The institution of the pardons board is enshrined in the Pennsylvania Constitution. It is, like I said, a pathway to the governor, a straining to the governor. You can describe it in many different kinds of ways. Do you know of any case where the commutation or the pardon board's determination of commutation has been challenged in a court?  Snodgrass. Pardon me? Snodgrass case. I'm sorry? Snodgrass. I'm not familiar with that. I'm sorry. There's a state Supreme Court case in Nevada, which we cited below, and there's also some litigation in Wisconsin, I believe, that's ongoing right now, where that is being challenged. I suggest to you that Pennsylvania is a unique state for a lot of different reasons. It's got one of the largest lifer populations in the country. It's one of the only states in the country where first and second degree murder conviction results in life without parole. There are a whole bunch of reasons why this is where this litigation has occurred. This is also a state that has the most restrictive, now, since the 1997 rules, the most restrictive commutation system in the country. It's got a board of five people who have to be unanimous. Two of the members of the board are elected public officials, and we know from the 1994-1995 example what happens when a public official, what can happen when a public official recommends commutation of a lifer. It's got a crime victim on the board. This just does not exist anywhere else in the country. These kinds of restrictive, narrow openings for commutation doesn't exist anywhere, and I would suggest it's the application of those new factors that have imposed this additional hardship on life convicted prisoners that violate the ex post facto clause. Are you familiar with a case from the Eighth Circuit, Snodgrass v. Robinson? I am not. That dealt with this issue? I am not. I'm not aware of that. Well, it involved commutation, and the court found that because an additional step had to be taken, that is, that matter had to go to the governor, and as we've all recognized, the governor is entirely free to make whatever decision he or she wishes, that the whole decision-making process was too speculative, and further, of course, the governor, for the reasons that were stated by Judge Alarcon, the governor simply did not have to abide by the recommendation. So at least there's one court that seems to go the other way. You might want to take a look at that case. Okay, I'd be happy to. If I could address that in a letter to the court, I'd enjoy that opportunity. Happy to do that. Thank you. I think the point I wanted to make there also was that the Supreme Court cases that I've cited in my brief that talk about standing are also applicable here in this context, because we don't really need to prove what's going to happen in the future. No one can prove what's going to happen in the future. The means that we go about the analysis in the Lentz case, it talks about procedural changes versus substantive changes. It would appear that what we have here is a procedural change in the commutation process, and it sounds as if what you're arguing is that, in fact, it's really a substantive change. If that's the case, how so? Well, I think you look at cases like that, like Lentz and other cases like that. Garner, I think, is another one. Those talk about those are procedural changes in terms of, for example, the interval between applications for parole, one of those cases dealt with. Right. That is purely procedural. Here, this is very substantive in terms of what standard someone has to pass in order to get to the governor's office. Before, you had to get three votes. Now you have to get five votes, and you have to get five votes on a panel that's made very much more anti-commutation by its change in composition. These changes were made specifically in the context of the Mudman Simon and the Reginald McFadden incidents for the specific purpose of getting tougher on crime, but for making it harder for people to get out of jail. Let's assume that it is three for the moment. We're all speculating as to what the governor would do, and that fits pretty squarely within the Eighth Circuit's rationale that we're guessing. And in Mickens-Thomas, it was pretty clear that it would affect parole. Here, we're guessing that it might affect commutation. Well, it does affect commutation because if you don't get the approval of the commutation board, you have zero possibility. It does affect the ability to go to the final step, but the final step is the one the governor has the discretion to make that decision. Correct. We don't know what the governor would do. Correct. It would seem if the governor were to say, look, in a case like this, with this person's record, if it came to me, yes, I would grant commutation, or I would be inclined to grant commutation, that might take it out of the range of speculation. Of course, no governor is likely to do that. I don't think we need to prove what a third person is going to do in this case, the governor. I don't think we need to prove what a third person, i.e., the commutation board, is going to do. This is about an opportunity. This is about an opportunity to have the governor commute your sentence, which, as Mickens-Thomas shows, doesn't necessarily, doesn't equate to get out of jail. It equates to having the right to parole. Whether Mickens-Thomas applies to this or not, you've got Supreme Court cases like Morales, which say, among other things, quote, any of a number of minor and perhaps inevitable mechanical changes that might produce some remote risk of impact on a prisoner's expected term of confinement doesn't get you to the point where there is a problem. There is no violation of the ex post facto clause. And it would seem that this is a mechanical change. You could argue it's not minor. But what it does is it produces or increases the risk of an expected term of confinement, possibly. And when we have seen that there are very few confinements actually commuted, even when they have been recommended post-94, it's almost asking us to, I keep coming back to speculate, but to guess what the governor might do. No, I don't think this has anything to do with guessing as to what the governor might do. How many people does this really affect? I'm sorry? How many people does this affect? We have Thompson. We have Smith. But how many have really applied before Hollis and gone through the system of the 100 people that are a member of the Prison Society? There's nothing in the record on that. I have some thoughts as to why not. But the record is that since between the passage of the amendment in 97 and the date of when discovery ended in 2009, I guess it was, there were three or four people that had received majority but not unanimous votes. One of those individuals had passed away. Smith and Thompson were two others. There was a fourth person, a Mr. Wirtz, who had received a four-to-one preliminary vote in about the same time, and the Pardons Board sat on it and hadn't at the time of the hearing made a final vote. And I can tell you, well, my guess as to why not is because they didn't know what the heck rule was going to apply, whether it was the majority rule or the unanimous rule. So I think it's tough to look at what's gone on since this litigation began and say this is an objective analysis, this is an objective average period of time. I would say go back farther. You look back at the Milton Schaap administration, for example, and I believe the statistics were that he approved 80 percent, somewhere around 80 percent of the positive recommendations. There was a big number back then that changed dramatically. Yeah, and who's to say it won't change back again? Your argument in this case refers only to those people sentenced prior to 1997? I believe that the proper would be people whose crimes were committed prior to 1997. Right, and sentenced prior to that time. I don't think the sentence needs to be before 1997, but I won't quibble with you on that. I think your argument, I thought your argument was that their expectation when sentenced prior to 1997. That's correct. Was that they would be eligible for compensation. That's right, that's right. All right, if they're sentenced after 1997, it's a different case. That's true, that's true. Thank you. Are there any more questions? No. Good, thank you very much. Thank you, Your Honors. Ms. Satt? Thank you. Judge Alarcon, I can think of one case that sort of indirectly addresses the point you were talking about, the notion of dealing with or affecting the executive versus the judicial clemency. In Herrera v. Collins, there is some discussion about the nature of executive clemency and how it's outside of the scope of the criminal justice system by design, so that it's a safety valve in case the criminal justice system, something falls through the cracks, and that we have this whole separate concept of clemency that can cure problems. But off the top of my head, that's the only one I can think of that may have addressed that to some degree. And we do quote a portion of it in our blue brief, our opening brief. I do want to mention, just in the interest of, just to be clear, the Pennsylvania courts have taken a slightly different view on ex post facto, and most recently they've rejected a challenge very similar to the one involved here that was styled as both a bill of attainder and ex post facto claim. It is not a published opinion, however, and it does not have precedential value. In fact, it's just a per curiam order at two different levels. It was at the Commonwealth Court level and then at the Supreme Court level, but they rejected a challenge by some 500 inmates that were filed making these similar types of claims. I just didn't want you to think that nothing had been done on the state end of things. I also wanted to mention, too, that Mr. Winston complains about all these adverse characteristics about the change in the pardons process, and it's important to remember how we got there. This was done by the voters of Pennsylvania. It was a change by the electorate. This wasn't just an act of the legislature. It went far beyond that, and it was overwhelmingly supported by the population. In some of the earlier briefs in this case, we did note that. There are also, too, in terms, the court had some questions about statistical evidence. There was a wealth of statistical evidence in some of the different records. In the original opinion of this court, they quoted the original stipulation about, but in the trial court itself and in some of the post-sentencing briefs, we discussed the fact that there is a seat change, circa 94, 95, largely because of the Reginald McFadden incident, but there has been a dearth of approvals, and the key element, again, is not just it's that merit review thing, and I think even one of the plaintiff's own witnesses mentioned that the key to trying to get a commutation is getting over the merit review hurdle, and if you're not there, you're not in the place where the rule affects you. Thank you, Ms. Sapp. We thank counsel for a very helpful argument. We will take the case under advisement. Thank you, Your Honor. Thank you, Your Honor.